[Cite as *In re the Adoption of W.K.S.*, 2014-Ohio-3847.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY

IN THE MATTER OF THE
ADOPTION OF: W.K.S.


Appellate Case No.    2014-CA-16

Trial Court Case No.   2013-AD-12


(Domestic Relations Appeal from
 Common Pleas Court-Probate Division)

. . . . . . . . . . .

O P I N I O N

Rendered on the 5th day of September, 2014.

. . . . . . . . . . .

RICHARD A. MEYER, Atty. Reg. No. 0002389, One Monument Square, Suite 200, Urbana, Ohio 43078
     Attorney for Appellant

KIRK D. ELLIS, Atty. Reg. No. 0055275, 121 South Main Street, Urbana, Ohio 43078
     Attorney for Appellee

. . . . . . . . . . . .


WELBAUM, J.


{¶ 1}    Appellant, J.S., appeals from a judgment of the Champaign County Common

Pleas Court, Probate Division, which held that the consent of Appellee, R.B., would be required before J.S. may adopt R.B.'s son, W.K.S. J.S. contends that the trial court erred in finding that R.B. had justifiable cause for failing to communicate with W.K.S. for at least one year prior to the filing of the petition for adoption.

{¶ 2} We conclude that the trial court did not err in concluding that R.B.'s failure to communicate with the minor child was justifiable. The child's mother significantly discouraged communication between the minor child and his father. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

{¶ 3} On August 29, 2013, Appellant, J.S., filed a petition in the Champaign County Common Pleas Court, Probate Division, seeking to adopt a minor child, W.S.B., and to change the child's name from W.S.B. to W.K.S.[1] At the time, J.S. was married to W.K.S.'s mother, S.S., and the petition alleged that the consent of the minor child's father, R.B., was not required because R.B. had failed to communicate with W.K.S. for at least one year before the petition was filed.

{¶ 4} After R.B. filed an objection to the adoption, the trial court held an evidentiary hearing on January 14, 2014. At that time, the court heard testimony from J.S., S.S., R.B., Michelle E. (a friend of S.S.), and Cindy B., the child's maternal grandmother. According to the testimony, W.K.S. was born on December 2, 2007, and his parents, R.B. and S.S., were divorced

---

[1] To lessen confusion, we will refer to the minor as W.K.S., as the case is captioned using those initials, even though the minor's actual initials are W.S.B, and the child's name has not yet been changed.

in March 2011. R.B. was ordered to pay child support for the child, and also exercised visitation every other weekend until June 2011. At that time, R.B. told S.S. that he did not want any more parenting time until he could get his life back together. According to R.B., he was moving around a lot, had severe depression, and did not have a steady job; it was difficult to function in every day life. He also felt his situation was not the best for W.K.S.

{¶ 5} When S.S. and R.B. had this discussion, S.S. was picking up W.K.S. from his weekend visitation with his father. R.B. packed up all of W.K.S.'s belongings, other than his bed, and put them in S.S.'s car. R.B. did not thereafter see or communicate directly with his child. He did drop off presents and some Christmas money for W.K.S. in December 2011. These gifts were given to Cindy B., who was S.S.'s mother. In addition, R.B. continued to financially support the child, and was current in his child support at all relevant times.

{¶ 6} In September 2011, S.S. married J.S., and she and W.K.S. lived with J.S. thereafter, once J.S. returned home in April 2012 from a tour in Afghanistan. J.S. was in the military reserves, and was stationed in Afghanistan from May 2011 to April 2012.

{¶ 7} In June 2012, R.B. obtained a steady job and began looking for an apartment. At that time, R.B. called S.S. to let her know that things were going better and that he would like to see W.K.S. In response, S.S. said that she wanted to start slowly, like meeting at a park, and R.B. agreed that starting slowly would be a good idea. Nothing was set up then, because, according to R.B., S.S. told him that she wanted to wait until the child was a little older before R.B. came back into his life. S.S. stated that her purpose in having R.B. wait was so that W.K.S. could understand the situation better. S.S. did not provide R.B. with a specific age or time frame. Although R.B. did not like the idea of waiting a long period of time, he did want to

respect S.S.'s wishes.

{¶ 8}   Subsequently, on October 31, 2012, R.B. sent S.S. a text message and asked how W.K.S. was doing.   R.B. also asked for Halloween pictures, and wanted to know what he could get W.K.S. for Christmas.   S.S. replied a month later, sending pictures.   However, she also sent the following message, quoted verbatim:

> I have been thinking long and hard about sending you pics of [W.K.S.] the main reason I have not because I'm so afraid you will swing back in his life like nothing happened and I can't let that happen he is happy and healthy he will in no way understand what's going on he is not old enough please understand I do all this for my son but I will send you pics and in return I hope you will think of him first and not swing in and out and hurt him please he needs time to grow up so he will understand.

Exhibit B, p. 1.

{¶ 9}   R.B. was upset after receiving this message, but he did not make arrangements to see W.K.S., due to S.S.'s statement that W.K.S. needed time to grow up. R.B. hoped that S.S. would let him know when W.K.S. was old enough to understand what was going on.

{¶ 10}   Less than a year later, S.S.'s husband, J.S., filed a petition to adopt W.K.S.   The petition, which was filed in late August 2013,  indicated that R.B.'s consent was not needed because he had failed to communicate with W.K.S. for at least one year prior to the filing of the petition.   At trial, S.S. testified that she and J.S. had talked about pursuing adoption for about a year before the petition was filed.

{¶ 11}   After the evidentiary hearing, the trial court held that R.B. had failed to

communicate with W.K.S. for more than a year prior to the filing of the petition. However, the court also concluded that R.B.'s consent was required because his failure to communicate was justifiable. The court's decision was based on S.S.'s significant discouragement of communication between the child and R.B.

{¶ 12}    J.S. appeals from the decision that R.B.'s consent is required for an adoption.

## II.   Was the Failure to Communicate Justified?

{¶ 13}    J.S.'s sole assignment of error states that:

The Trial Court Erred in Finding that Respondent Had "Justifiable Cause" for His Failure to Communicate With His Minor Child for at Least One Year Prior to the Filing of the Petition of Adoption.

{¶ 14}    Under this assignment of error, J.S. contends that S.S. did not significantly discourage communication between R.B. and W.K.S., and that R.B.'s consent to the adoption is not required.

{¶ 15}    With regard to adoptions, R.C. 3107.07 provides, in pertinent part, that:

Consent to adoption is not required of any of the following:

(A) A parent of a minor, when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement

of the minor in the home of the petitioner.

{¶ 16}   "Because cases such as these may involve the termination of fundamental parental rights, the party petitioning for adoption has the burden of proving, by clear and convincing evidence, that the parent failed to communicate with the child during the requisite one-year period and that there was no justifiable cause for the failure of communication." (Citations omitted.)   *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985).   "Once the petitioner has established this failure, the burden of going forward shifts to the parent to show some facially justifiable cause for the failure. * * * The burden of proof, however, remains with the petitioner."   *In re A.N.B.*, 12th Dist. Preble No. CA2012-04-006, 2012-Ohio-3880, ¶ 10, citing *In re Adoption of Bovett*, 33 Ohio St.3d 102, 104, 515 N.E.2d 919 (1987).

{¶ 17}   We recently noted that "probate courts undertake a two-step analysis when applying R.C. 3107.07(A)."   *In re Adoption of J.R.H.*, 2d Dist. Clark No. 2013-CA-29, 2013-Ohio-3385, ¶ 26, citing *In re Adoption of M.B.*, 131 Ohio St.3d 186, 2012-Ohio-236, 963 N.E.2d 142, ¶ 23.   "The first step involves deciding a factual question – in that case [*M.B.*], whether the parent had willfully failed to provide for the support and maintenance of a minor child."   *Id.*   "In the second step, if a probate court finds a failure of support, the court then determines 'whether justifiable cause for the failure has been proved by clear and convincing evidence.' "   *Id.,* citing *M.B.* at ¶ 23.

{¶ 18}   " ' "[T]he question of whether justifiable cause for failure to pay child support has been proven by clear and convincing evidence in a particular case is a determination for the probate court and will not be disturbed on appeal unless such determination is against the

manifest weight of the evidence." ' " *J.R.H.* at ¶ 27, quoting *M.B.* at ¶ 24. (Other citation omitted.)

{¶ 19} In *J.R.H.,* we stressed that the issues in *M.B.*, which pertained to the issue of financial support, "are similar in nature to those involving contact with the minor child. The first consideration is whether the parent has had more than de minimis contact with the child. This is a factual consideration. If the trial court decides that issue adversely to the parent, then the court further considers whether the lack of contact is justifiable." *J.R.H.* at ¶ 28. We again observed that we "will not disturb the trial court's determination on this point unless it is against the manifest weight of the evidence." *Id*. at ¶ 36, citing *M.B.* at ¶ 24.

{¶ 20} " 'In determining whether a judgment is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice" that there must be a reversal of the judgment and an order for a new trial.' " *In re B.A.H.*, 2d Dist. Greene No. 2012-CA-44, 2012-Ohio-4441, ¶ 21, quoting *Steagall v. Crossman*, 2d Dist. Montgomery No. 20306, 2004-Ohio-4691, ¶ 29.

{¶ 21} With regard to justifiable cause, the Supreme Court of Ohio has held that "[s]ignificant interference by a custodial parent with communication between the non-custodial parent and the child, or significant discouragement of such communication, is required to establish justifiable cause for the non-custodial parent's failure to communicate with the child." *Holcomb*, 18 Ohio St.3d at 361, 481 N.E.2d 613, paragraph three of the syllabus.

{¶ 22} The *Holcomb* court refused to adopt a "precise and inflexible meaning" for

"justifiable cause," but instead stated that "the better-reasoned approach would be to leave to the probate court as finder of fact the question of whether or not justifiable cause exists." *Id.* at 367, citing *In re Adoption of McDermitt*, 63 Ohio St.2d 301, 408 N.E.2d 680 (1980). In this regard, the Supreme Court of Ohio stressed that " [t]he probate court is in the best position to observe the demeanor of the parties, to assess their credibility, and to determine the accuracy of their testimony." *Id.*

{¶ 23} In the case before us, R.B. contacted S.S. on two occasions regarding W.K.S., and in both instances, S.S. asked him to wait to visit until the child was older and could understand what was happening. On the last occasion, which was within the year prior to the attempted adoption, S.S. made this request while knowing that she and her husband were contemplating adoption. Although R.B. could have been more assertive in pressing for visitation, he was attempting to comply with what the mother of the child deemed best, and he should not be penalized for doing so.

{¶ 24} In arguing that consent should not be required, J.S. contends that S.S. did not try to keep W.K.S. from his father, and, in fact, allowed the paternal grandmother and her husband to see W.K.S. on a few occasions. J.S., therefore, contends that R.B. should have tried to see the child at his mother's home. However, at trial, R.B. testified that he did not see W.K.S. at his mother's house because he and S.S. had divorced on rough terms, and he did not want to cause a scene. He also said he was afraid that if he asked to see the child at his mother's house, S.S. would refuse to let his mother and her husband see the child.

{¶ 25} Again, the trial court found R.B. credible and concluded that S.S. had significantly discouraged contact with the child. The trial court was in the best position to view

the witnesses and make credibility decisions.   After reviewing the evidence, we cannot find that the trial court clearly lost its way and created a manifest miscarriage of justice.

{¶ 26}    Accordingly, the sole assignment of error is overruled.


### III.   Conclusion

{¶ 27}    J.S.'s sole assignment of error having been overruled, the judgment of the trial court is affirmed.


. . . . . . . . . . . .

FROELICH and HALL, JJ., concur.




Copies mailed to:

Richard A. Meyer
Kirk Ellis
Hon. Brett A. Gilbert